(102 P.3d 1169)
No. 92,189

Steve L. Lyons, *Appellee,* v. IBP, Inc., *Appellant.*

Opinion filed December 17, 2004.

*Douglas M. Greenwald* and *Gregory D. Worth*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellant.

*Judy A. Pope*, of Dickson & Pope, P.A., of Topeka, for appellee.

Before HILL, P.J., MARQUARDT and JOHNSON, JJ.

JOHNSON, J.: IBP, Inc. appeals the Workers Compensation Board (Board) order affirming the administrative law judge's award granting workers compensation benefits to Steve L. Lyons. Specifically, IBP appeals the determination that Lyons was permanently and totally disabled and the denial of any credit or offset for preexisting functional impairment. We affirm.

## Previous Injury

Lyons first experienced a work-related cervical spine injury on June 13, 1990, while employed at the Bunge Corporation. As a result of that injury, he had an anterior cervical discectomy at C5-6. Eventually, Lyons returned to full-time work, without restrictions. On October 21, 1991, Dr. James I. Horsely found a total impairment to the person of 34 percent using the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides).

## Current Injury

In November 1998, Lyons went to work for IBP, Inc. on its special projects crew; his job duties included "design, fabrication, installation of new equipment, or the reconstruction of old equipment." On July 10, 1999, while lifting equipment, Lyons experienced pains through his arms, shoulder, down his back, across the buttocks, and the left leg. That same day, Lyons reported the injury to a supervisor and went to the emergency room.

IBP sent Lyons to see Dr. J. Rob Hutchison, who initially reported finding "low back pain with radiculopathy." The doctor ordered a CT scan, prescribed medications, and kept Lyons off of work. The CT scan revealed a bulging in the L4-L5 area and evidence of spinal stenosis, prompting Dr. Hutchison to refer Lyons

to an orthopedic surgeon, to impose work restrictions, and to refer Lyons to physical therapy.

Dr. William O. Reed, Jr., who is board certified in orthopedic surgery with a separate certificate in surgery of the upper extremity, assumed Lyon's treatment on August 9, 1999. At the initial visit, Lyons complained of "pain in the lower back and the left leg pain radiating in a total sonic distribution of the entire posterior half of his leg." Dr. Reed was concerned about Lyons' long tract signs, which he described as abnormal reflexes in the lower extremity caused by traumatic or disease-related abnormalities of the motor nerves. Dr. Reed then ordered a series of MRIs. Lyons also complained of pain in his left shoulder, and Dr. Reed evaluated the shoulder at the same time that he treated the cervical condition.

The tests revealed a herniated disc at C4-5, which the doctor attributed to the July 1999 injury at IBP. Dr. Reed also reported that the herniated disc was overlying preexisting degenerative disc disease at C4-5 and that "furthermore was made somewhat more likely to occur statistically based upon the previous fusion accomplished at C5-6." Because the herniated disc was causing severe stenosis of the spinal canal, Dr. Reed performed anterior discectomy and fusion at C4-5 on October 3, 1999. This is the same procedure that Lyons had for his previous injury at the C5-6 level.

Dr. Reed continued to attend Lyons for postoperative care, during which Lyons was experiencing discomfort in his neck and lower extremities. Dr. Reed ordered a cervical myelogram and CT scan done on October 20, 1999, and in December 1999, Lyons reported abnormal reflexes, weakness, and instability (clonus). Dr. Reed was unable to determine whether these symptoms were due to an increase in long tract signs or to recovery with accompanying swelling.

On February 17, 2000, Dr. Reed performed an arthroscopic evaluation and decompression and rotator cuff repair on Lyons' left shoulder. Dr. Reed was unable to determine what caused the rotator cuff tear, nor was he able to temporally relate the tear.

On March 2, 2000, Lyons complained to Dr. Reed that he was experiencing sharp pains, deterioration in his gait while walking, and arm weakness. A neurologist who saw Lyons raised the pos-

sibility that syrinx of the cervical spine was causing Lyons' progressive symptoms. Dr. Reed ordered an MRI, which did not reveal any problems except for spinal stenosis at C3-4 that had already been noted. An MRI of the shoulder revealed a possible full thickness rotator cuff tear, which was repaired by Dr. Reed.

On April 17, 2000, Dr. Reed completed a form letter for IBP, stating that Lyons had reached maximum medical improvement for his neck and back. By June 2000, Dr. Reed reported that the therapy and attention was being directed to the recovery of the rotator cuff tear. Lyons returned to Dr. Reed on February 1, 2001, complaining of a gradual deterioration in control of his upper and lower extremities. Dr. Reed ordered a series of MRI and EMG studies, which revealed a new herniated disc at C5-6, but there was no new radicular disease. Abnormalities in the biceps, deltoid, triceps, brachioradialis, and flexor carpi ulnaris in both upper extremities were disclosed by the EMG test. Dr. Reed discovered that the level of the new herniation had been mislabeled and it was actually at C6-7.

Dr. Reed testified that the work-related injury could have weakened the disc and, because of the fusion at the adjacent level, the increased loads could have caused the disc to fail. In trying to determine whether the C6-7 herniation was more related to Lyons' injury in 1990 to the C5-6 level or to his injury in 1999 that involved C4-5, Dr. Reed opined that "the temporal relation is that the C6-7 disc is more likely due to the contribution from a second level fusion at C4-5 than from the single-level fusion at C5-6. But, again, that is a statistical statement." Dr. Reed noted that Lyons had been without a herniated disc at C6-7 for a considerable period of time after the first fusion performed in 1990.

The C6-7 herniation became progressive, requiring an anterior cervical discectomy and fusion on November 20, 2001. The next month, Dr. Reed ordered another MRI because Lyons complained that his condition had worsened. There were no specific abnormalities found.

Lyons continued to exhibit long tract signs, which Dr. Reed reported had worsened through the process of decompression. Because Lyons' long tract signs were similar to a spinal cord injured

patient, Dr. Reed referred Lyons to Dr. Simon, a physiatrist, to manage Lyons' difficulties with upper extremity and lower extremity spasticity.

On September 9, 2002, Dr. Reed determined that Lyons had reached maximum medical improvement. On March 27, 2003, Dr. Reed wrote a letter for IBP, detailing his opinion as to the nature and extent of Lyons' functional impairment. Dr. Reed testified that Lyons' rating using the AMA Guides is very complicated. He rated Lyons with 55 percent whole body impairment, if the rotator cuff injury is not included, and 59 percent whole body impairment with the rotator cuff injury included. The ratings included prior injuries.

During the deposition, Dr. Reed stated that he believed Lyons was employable, in general. His recommended permanent work restrictions were: sedentary occupation, no lifting over 10 pounds, frequent ambulation would be difficult due to spasticity, and repetitive and accurate dexterous motions and movements of the upper extremities would be difficult also due to spasticity. Dr. Reed also testified that Lyons' condition had not objectively worsened since the last surgery, in contrast to the result of the first spinal cord surgery.

Dr. Sergio Delgado, an orthopedic surgeon, was appointed to evaluate Lyons, and his initial report, dated December 2002, was based on Lyons' then current medical records and physical evaluation. The doctor later reviewed Lyons' medical records from his 1990 injury and wrote an addendum to his report. Dr. Delgado reported that most of the findings and complaints are related to the work injury and operative procedures. He did not believe that Lyons could participate in either active or sedentary work over an 8-hour period in the future. Yet, Dr. Delgado also testified that, if accommodated, Lyons could mow grass with a riding lawn mower or be a ticket taker at a theater. Dr. Delgado said Lyons had the ability to perform some type of substantial employment, with accommodation, but expressed doubts that Lyons could be significantly productive in a permanent 8-hour job. He reported that Lyons' condition is currently static.

Dr. Delgado reported that a review of the earlier medical records showed that Lyons exhibited long tract signs in 1990-91, after

his 1990 injury, and that once the condition stabilizes, the long tract signs will not progress without additional trauma. He did not believe that Lyons would have encountered problems at C4-5, 10 years after the 1990 injury, without the trauma of the July 1999 injury. Dr. Delgado said that he did not know whether the last C6-7 herniation was related to the 1999 work injury. He stated that it could have been present but never surgically treated, or it could be a separate herniation from trauma or from increased mobility due to the C4-5 and C5-6 fusions.

Dr. Delgado rated Lyons with 69 percent whole person impairment, including his 1990 injury based on the AMA Guides. Based on information from Lyons about the earlier injury, Dr. Delgado assigned 15 percent whole body to the earlier injury, making 54 percent of his whole body impairment due to the 1999 injury.

Dr. Delgado also testified that after reviewing the earlier treatment records, if Lyons' long tract signs had persisted, then the 34 percent impairment rating that he had been given at the time would be appropriate. The record is not clear about whether long tract symptoms persisted. Lyons worked full duty at IBP until his July 1999 injury.

*Work at IBP since injury*

Following the July 10, 1999, injury, Lyons worked in the IBP laundry on light duty July 22-26, 1999. He returned to the laundry on light duty July 29 to August 13, 1999. He then was moved to belt wiping or monitoring from August 13 to August 30, 1999. Lyons returned to regular duty August 30 to September 6, 1999. The complex manager testified that his records did not indicate whether Lyons was performing all of his duties, but he surmised that Lyons was probably working with restrictions. Lyons began a leave of absence in mid-September 1999; he has not worked anywhere since that time. Currently, Lyons is receiving Social Security disability.

*Vocational Evaluations*

Lyons participated in vocational evaluations with Dick Santner, hired by Lyons, and Steve Benjamin, hired by IBP. After inter-

viewing Lyons and reviewing his medical record, Santner developed a task list and report. Considering Lyons' work history and educational background, Santner did not believe that Lyons was employable in the open labor market.

Benjamin also reviewed Lyons' medical record and interviewed him to develop a task list and report. Benjamin determined that Lyons should complete a 2-year associate's degree in computer-aided drafting in light of the fact that he had done some work in that area in the past. If he did not get the education, Benjamin believed that Lyons could get an unskilled sedentary job, such as ticket taker or telephone operator.

*Workers Compensation Benefits*

In an order filed February 16, 2000, Lyons was awarded medical treatment and temporary total disability compensation, commencing September 13, 1999. Lyons was granted medical treatment with Dr. Reed, including shoulder surgery, in an order filed May 23, 2000. In an order filed August 24, 2000, the administrative law judge ruled that Lyons' benefits were not subject to child support withholding and that there had been an underpayment of temporary total benefits. In an appeal of this order, the Board reversed the decision regarding child support withholding.

Lyons' application for additional temporary total compensation was denied on January 19, 2001. The order stated Lyons was offered accommodated employment and refused it. Temporary total disability commencing June 28, 2001, and medical treatment for surgery at C6-7 was granted in an order filed October 3, 2001. This decision was appealed, and the Board affirmed the order. Lyons was ordered to an independent medical evaluation on October 18, 2002.

On August 6, 2003, the administrative law judge awarded Lyons 118 weeks of temporary total disability and permanent total disability. Additionally, Lyons was entitled to future medical care upon application and review. The administrative law judge denied a credit under K.S.A. 44-501(c), because the statute was not applicable under a finding of permanent total disability.

IBP appealed the award. The Board adopted the stipulations listed in the award. The Board modified the number of weeks for the temporary total disability compensation, but otherwise adopted the administrative law judge's findings. IBP timely appeals this decision.

## DEFINITION OF PERMANENT AND TOTAL DISABILITY

First, IBP contends that the Board applied an incorrect definition of permanent total disability, which resulted in a lesser standard than that required by the current version of the Workers Compensation Act. To the extent the question involves statutory interpretation, our review is unlimited, albeit we give due consideration to the Board's interpretation. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 11, 81 P.3d 425 (2003).

The Board stated that "[a]n injured worker is permanently and totally disabled when rendered 'essentially and realistically unemployable,'" citing to *Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, 872 P.2d 299 (1993). IBP contends that *Wardlow* was wrongly decided because it relied on a construction preference in favor of the claimant, which had been legislatively eliminated some 6 years before the decision. The argument isolates the following language from the opinion:

"Our Supreme Court has stated that 'when a workers' compensation statute is subject to more than one interpretation, it must be construed in favor of the worker if such construction is compatible with legislative intent.' *Houston v. Kansas Highway Patrol*, 238 Kan. 192, 195, 708 P.2d 533 (1985), *overruled on other grounds Murphy v. IBP, Inc.*, 240 Kan. 141, 727 P.2d 468 (1986). The trial court's finding that Wardlow is permanently and totally disabled because he is essentially and realistically unemployable is compatible with legislative intent." 19 Kan. App. 2d at 113.

Subsequent to the *Houston* decision, in 1987, the legislature adopted K.S.A. 44-501(g), which provides, in pertinent part, that "[t]he provisions of the workers compensation act shall be applied impartially to both employers and employees in cases arising thereunder." IBP argues that *Wardlow*'s use of the judicially created worker preference construction rule violated the legislatively man-

dated impartial application rule and, therefore, we must disregard *Wardlow's* interpretation of K.S.A. 44-510c(a)(2). We disagree.

K.S.A. 44-510c(a)(2) provides:

"Permanent total disability exists when the employee, on account of the injury, has been rendered *completely and permanently incapable of engaging in any type of substantial and gainful employment*. Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, in the absence of proof to the contrary, shall constitute a permanent total disability. Substantially total paralysis, or incurable imbecility or insanity, resulting from injury independent of all other causes, shall constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts." (Emphasis added.)

After discarding all of the *Wardlow* opinion, IBP proffers its interpretation of the statutory language, italicized above, by stringing together its definitions of the individual terms. Most notably, IBP argues that "substantial" simply means "consistent or regular" and that "gainful" simply means "employment for wages." Therefore, IBP contends the standard to be applied "is not 'essentially' unemployable, but 'completely and permanently' unemployable." The suggestion is that a seriously injured and disabled employee should not be deemed permanently and totally disabled if he or she can earn any amount of money on a regular basis, *e.g.* apparently, IBP believes that 1 hour a week for minimum wage or even 5 minutes once a month for a quarter would suffice to negate permanent total disability. IBP does not explain why such a Draconian standard would not violate its own proffered legislatively mandated application rule by being particularly favorable to employers. Regardless, with or without *Wardlow*, we would reject IBP's statutory interpretation as being contrary to legislative intent.

A full reading of *Wardlow* suggests that its ultimate holding did not depend on the application of a favorable construction rule. The opinion held that the determination of whether a claimant is permanently and totally disabled is a factual finding. 19 Kan. App. 2d at 112. That statement is supported by a plain reading of the last sentence of K.S.A. 44-510c(a)(2), directing that "disability shall be determined in accordance with the facts." The court then discussed the factors to be considered and approved a totality of the circum-

stances approach. Ultimately, the court held that the "evidence provides a substantial basis of fact from which the trial court could reasonably find that Wardlow is 'completely and permanently incapable of engaging in any type of substantial and gainful employment' under K.S.A. 1992 Supp. 44-510c(a)(2)." 19 Kan. App. 2d at 115. In other words, the opinion used the standard set forth in the statute, rather than substituting a lesser standard.

The Board correctly noted that "*Wardlow* still provides precedential guidance regarding what factors should be considered in the factual determination of what constitutes permanent and total disability." Its ruling that "essentially and realistically unemployable" is compatible with legislative intent, comports with the totality of circumstances approach to factually determining permanent total disability. The Board did not apply an improper legal standard.

## SUBSTANTIAL COMPETENT EVIDENCE

IBP challenges the sufficiency of the evidence to support a finding that Lyons was permanently and totally disabled. The determination of whether the Board's findings of fact are supported by substantial competent evidence is a question of law, although the appellate court does not reweigh the evidence or determine witness credibility. *Webber v. Automotive Controls Corp.*, 272 Kan. 700, 703, 35 P.3d 788 (2001).

The Board considered the significant impairment ratings given by both Dr. Reed and Dr. Delgado, Lyons' ongoing spasticity in both upper and lower extremities, and the opinions of Dr. Delgado and Santner on Lyons' ability to be employed, and arrived at the conclusion that Lyons cannot engage in substantial and gainful employment. In doing so, the Board specifically noted the opinions of Dr. Reed and Benjamin with regard to Lyons being able to do sedentary work, at least on a part-time basis. *Cf. Wardlow*, 19 Kan. App. 2d at 115 (existence of evidence that Wardlow can perform part-time, sedentary-type work does not invalidate factual findings below). The Board specifically found that Dr. Delgado and Santner were more realistic in recognizing Lyons' condition and significant impairments and, thus, were more persuasive.

" 'Summarizing, the Board reviews questions of law and fact. The appellate court reviews questions of law. Whether a decision is supported by substantial competent evidence is a question of law. The appellate court does not reweigh the evidence or determine the credibility of the witnesses.' " *Webber*, 272 Kan. at 704 (quoting *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 35, 991 P.2d 406 [1999]).

The Board's decision was supported by substantial competent evidence.

### CREDIT OR OFFSET FOR PRIOR FUNCTIONAL IMPAIRMENT

IBP claims the Board erred in refusing to reduce Lyons' award by the amount of preexisting functional impairment. As noted above, to the extent the issue involves the Board's factual findings, our review is for substantial competent evidence; to the extent the issue requires a statutory interpretation, our review is unlimited.

IBP bases its argument on K.S.A. 44-501(c), which provides:

"The employee shall not be entitled to recover for the aggravation of a preexisting condition, except to the extent that the work-related injury causes increased disability. Any award of compensation shall be reduced by the amount of functional impairment determined to be preexisting."

At oral argument, appellant conceded that if we agreed with the Board that the current injury was not an aggravation of a preexisting condition then our inquiry is over; IBP loses. The Board's negative finding that IBP "failed to establish that claimant's current injuries aggravated this preexisting condition [at C5-6]" is supported by the evidence as a whole and will not be disturbed on appeal, "absent an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice." *Nance v. Harvey County*, 263 Kan. 542, 551, 952 P.2d 411 (1997).

IBP points to Dr. Delgado's testimony that he would attribute 15% of the 69% cervical functional impairment to the earlier injury to C5-6. However, other testimony indicated that the old injury to C5-6 was separate and distinct; the evidence was not undisputed that the current injury aggravated the preexisting condition. After the initial injury in 1990, Lyons went back to work full-time, doing

hard manual labor without restrictions for nearly a decade before suffering the July 1999 injury.

IBP cites to cases applying K.S.A. 44-501(c) to awards of permanent partial disability. No mention is made of K.S.A. 44-510a, which provides:

"If an employee has received compensation or if compensation is collectible under the laws of this state or any other state or under any federal law which provides compensation for personal injury by accident arising out of and in the course of employment as provided in the workers compensation act, and suffers a later injury, *compensation payable for any permanent total or partial disability for such later injury shall be reduced, as provided in subsection (b) of this section, by the percentage of contribution that the prior disability contributes to the overall disability following the later injury. The reduction shall be made only if the resulting permanent total or partial disability was contributed to by a prior disability and if compensation was actually paid or is collectible for such prior disability. Any reduction shall be limited to those weeks for which compensation was paid or is collectible for such prior disability and which are subsequent to the date of the later injury. The reduction shall terminate on the date the compensation for the prior disability terminates or, if such compensation was settled by lump-sum award, would have terminated if paid weekly under such award and compensation for any week due after this date shall be paid at the unreduced rate.* Such reduction shall not apply to temporary total disability, nor shall it apply to compensation for medical treatment." (Emphasis added.)

Lyons settled his first injury claim on January 16, 1991, for $35,249.71. Although the record does not clearly indicate Lyons' weekly wage at the time, the prior permanent partial disability award appears to have terminated by the date of the second injury in July 1999. Thus, under K.S.A. 44-510a, no reduction in the permanent total disability would be warranted.

IBP separately briefs a claim that denying a reduction in the permanent total disability effects a windfall to Lyons. First, we question the propriety of our considering this policy argument, which is more properly within the ambit of the legislature. The Board did not address whether the two awards effected a windfall. However, "a previous disability rating should not affect the right to a subsequent award for permanent disability." *Baxter v. L.T. Walls Constr. Co.*, 241 Kan. 588, 593, 738 P.2d 445 (1987). As *Baxter* points out, K.S.A. 44-510a provides the method to reduce later awards if there is an overlap in the compensation, and a per-

manent partial disability award is intended to substitute for lost earning power so that once the award is made, the earning power is considered restored. 241 Kan. at 593.

In summary, the Board did not find that the July 1999 injury aggravated the 1990 injury; the compensation for the 1999 injury did not overlap the prior award; and the Board did not err in refusing to reduce or offset the current award.

Affirmed.