NOT DESIGNATED FOR PUBLICATION

No. 113,075

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ARDIS J. STARK,
*Appellant/Cross-appellee*,

v.

ATWOOD GOOD SAMARITAN CENTER and
SENTRY MUTUAL INSURANCE COMPANY,
*Appellees/Cross-appellants*.

MEMORANDUM OPINION

Appeal from Worker Compensation Board. Opinion filed July 29, 2016. Affirmed.

*Melinda G. Young*, of Bretz & Young, of Hutchinson, for appellant/cross-appellee.

*Brandon A. Lawson*, of Evans & Dixon, LLC, of Kansas City, Missouri, for appellees/cross-appellants.

Before BUSER, P.J., HILL, J., and WALKER, S.J.

*Per Curiam*: Ardis J. Stark appeals the Workers Compensation Board's (Board) denial of permanent total disability and work disability benefits for an injury that occurred when she caught a falling resident at work. Atwood Good Samaritan Center (Good Samaritan) and Sentry Mutual Insurance Company cross-appeal the Board's award of future medical treatment for her permanent partial disability. Because we find substantial competent evidence supports the Board's decisions, we affirm its findings.

1

Stark worked as a certified nursing assistant (CNA) for Good Samaritan. Her duties included walking with residents with a gait belt, pushing residents in wheelchairs, helping residents get dressed, assisting with the lifting or transferring of residents, perineal care, dental care, helping with nutrition, passing towels, and mopping and cleaning. She worked at least 32 hours a week. She had a 20-pound lifting restriction because of a lower back condition.

Stark underwent a cervical fusion in June 2011 because of nonwork related symptoms. She had been experiencing headaches, eye problems, and numbness in her arms and other extremities. An MRI showed herniated discs at four different points in her neck and an annular tear. Dr. Badejo performed surgery on two of those points. Stark returned to work after a couple of weeks, but there were significant restrictions on her activities. She started doing only very light duty a few hours a day, but by September 2011, she returned to her regular hours. Stark could not to push, pull, or lift anything over 5 pounds. She was able to put towels on a cart and push them around, but she could not push wheelchairs. She was going to physical therapy as part of her postoperative care.

On September 30, 2011, Good Samaritan was shorthanded and Stark was asked to answer a call light. She walked into the resident's room and saw the resident start falling backwards. Stark caught the resident so the resident did not fall. Stark yelled for help and other staff came and took the resident. Stark felt numb all over, had spasms in her shoulders and arms, and felt a stabbing pain. She said that she had never had muscle spasms like that before. Stark went to the emergency room and was given two muscle relaxers so an X-ray could be taken.

At a regular hearing before the administrative law judge (ALJ), Good Samaritan stipulated that Stark got hurt at work but denied that any permanent injury resulted from

that incident. Stark testified that, after the work incident, she had pain in areas that she had not had pain in before—her arms, upper back, and shoulder area that was "totally different than the surgery pain." She had muscle spasms and shooting pains that would go down her back. She testified that she saw Dr. Badejo twice after her work incident and, in November 2011, he released her from his care because the issues she was having were not connected to the surgery he had performed. She continued physical therapy. She took Flexeril, a muscle relaxant, and aspirin for the pain, and wore a TENS unit—an electrical stimulation device used to strengthen muscle tissue and diminish pain.

A couple of days after the work injury, Stark returned to work as a CNA performing very light tasks such as helping people eat and clerical work. Her hours were gradually cut down. She was no longer able to assist residents with nutrition because of the positions she would need to have her arms in and the length of time. In December 2012, she was moved to the activities department and was still working there at the time of the regular hearing. In January 2014, she worked 5 hours, in February she worked 5 hours, and in March she worked 2 hours. She no longer received health benefits because of the reduced hours she worked.

Stark testified that she has difficulty fixing her hair, making her bed, vacuuming, sweeping, and pushing a grocery cart. She could only drive 30 minutes at a time. She also had trouble lifting. Before the work incident, she was getting back to the point where she could do those things again after her surgery, for the most part. She still had a lifting restriction because of a lower back condition. Stark testified that she had trouble with any activity involving her arms and shoulders, even resting her arm on a chair for a length of time. She did not have those problems before the work incident. Stark had numbness in both shoulders prior to the work incident which she believed was going away as a result of the surgery. After the incident, she was in a lot of pain and experienced spasms in her shoulders. She used a cane for walking.

With regard to her mental health, Stark testified she was taking an antidepressant prior to the work incident, since 2004 when her husband died. She received two or three sessions of therapy in 2004. After the work incident, she felt new anger and frustration. She had to rely on her daughter to drive her places. She felt guilty when she had to go to a doctor's appointment. She lived in a rural area; it was 30 minutes to the next town. She could not garden anymore. She was very limited in what she could do and enjoy.

Dr. Pedro Murati evaluated Stark in July 2012 at the request of Stark's attorney. He diagnosed her with a preexisting cervical fusion, myofascial pain syndrome of both shoulder girdles extending into the cervical and thoracic paraspinals, and bilateral shoulder sprains. He testified that the diagnoses, except for the neck fusion, were a "direct result" of the work-related injury. As a result of the work injury, the doctor found she sustained a sprain to her neck and upper back, each a 5% impairment, for a total combination of 10% whole person impairment. Dr. Murati testified that Stark was "essentially and realistically unemployable." He recommended that she apply for Social Security disability. He recommended work restrictions because of a combination of both her work injury and her preexisting cervical fusion. He recommended no climbing ladders, no crawling, no heavy grasping, no above chest-level/shoulder-level work, and no lifting/carrying or pushing/pulling over 10 pounds.

Dr. Robert Barnett, a clinical psychologist, performed a psychological evaluation of Stark in November 2013 at the request of Stark's attorney. He diagnosed her with moderate dysthymic disorder (a form of depression) and mild anxiety disorder. He believed the causes were her injury, loss of employment, and loss of function. He assessed a moderate, 30% impairment using the American Medical Association Guides to the Evaluation of Permanent Impairment (2d ed. 1994) (AMA Guides). Dr. Barnett admitted that the later editions of the AMA Guides did not include impairment ratings for mental health disorders because the AMA decided there were no precise measures of impairment for mental disorders and the impairment ratings were removed from the

4

AMA Guides. He suggested that Stark seek treatment from a psychiatrist and supportive therapy from a mental health counselor, licensed psychologist, or licensed clinical social worker, stating that there was room for improvement.

Dr. Preston Koprivica examined Stark in January 2014 at the request of Stark's attorney. He testified that even though Stark had a prior impairment in the cervical region, her work accident was the "direct, proximate, and prevailing factor" in the new injury to the cervical regional. He characterized the new injury as "a chronic cervicothoracic strain or sprain injury or soft tissue injury with the development of regional myofascial pain in the cervicothoracic region." He testified that her shoulder girdle pain was a secondary manifestation of the myofascial pain. The MRI of her shoulders showed tendinitis but no rotator cuff tear.

Dr. Koprivica initially thought there could be some psychological contribution to the presentation of physical impairment and wanted validation from a mental health expert. Assuming her presentation was validated, then she was limited from activities above chest level and limited to sedentary below chest level physical activities. He testified that assuming validation, she was essentially totally disabled and could not sustain work. Dr. Koprivica reviewed Dr. Barnett's mental health evaluation and determined that it did validate Stark's physical presentation—there was no evidence of malingering. He felt there was "significant impairment attributable to the September 30th, 2011, accident." With the validation from Dr. Barnett, Dr. Koprivica opined that Stark was "permanently totally disabled based on the impairment following the September 30, 2011, injury."

Dr. Koprivica testified that, based on the work injury in isolation, Stark had a 5% whole person impairment. In addition, she had a 25% whole person impairment attributable to her prior fusion. Taking into account Dr. Barnett's finding of a 30% psychological impairment, Dr. Koprivica testified that Stark had a 35% whole person

5

impairment attributable to the work injury. He found her permanently totally disabled based on the work injury. Dr. Koprivica testified that he relied on the truthfulness of Stark's explanations for how her pain was different after the work injury than before—more widespread pain, new pain, and new spasms as a result of the work incident. The spasms were documented objectively. He testified she could only do 1 of the 13 tasks on her task list, a 92% task loss. The work restrictions were based on both her preexisting fusion and the work injury. Dr. Koprivica also testified that Stark would benefit from future pain management because of her work injury.

Dr. Barnett performed a wage and task loss assessment of Stark in February 2014. Dr. Barnett testified:

> "Based on her age, where she's living, her physical restrictions, it's hard for me to imagine how she could be employed at all. I think probably—this is just speculation, but I think probably they're trying to be nice to her at the Good Samaritan Home and give her something that she can do."

Dr. Steven Hendler performed a physical evaluation of Stark at the request of Good Samaritan. He testified that Stark had degenerative disc disease of the cervical spine that predated the work injury and pain associated with a general medical condition and psychological factors, such as depression, both prior to and after the work incident. His findings also included the following: Stark sustained a left trapezial strain injury at work on September 30, 2011; she was having symptoms in the left trapezius prior to September 30; and she sustained a temporary aggravation of her preexisting injury due to the work incident. Dr. Hendler testified that the work injury was not the prevailing factor causing any of her medical injuries. He further testified that she sustained no permanent impairment as a result of the accident at work. "The fact that the symptoms were present before the second event indicates in this case it's much more likely to have come from the postoperative state following her surgery as opposed to the work injury." A decreased

6

range of motion is "much more common following cervical fusion than it is following a trapezial strain." He testified her increase in symptoms over time from an injury that would not be expected to produce them and her history of depression suggested somatization. He would place her on no work restrictions because of the work injury alone.

Dr. Hendler concluded that her strain injury that occurred at work on September 30, 2011, was fully treated by mid-November 2011 based on Dr. Badejo's notes. But, Dr. Hendler did not have Dr. Badejo's reports from March 2012 or December 2013. Stark's physical therapy report from October 2011 stated that her pain was a 1 or 2 out of 10. Dr. Hendler did not review Stark's October 2013 cervical spine MRI, but he reviewed Dr. Koprivica's report that mentioned it. Regardless, he indicated he would not be able to tell from the MRI if any of changes were solely the result of her work injury.

Dr. Patrick Hughes, a psychiatrist, evaluated Stark in April 2014 at Good Samaritan's request. He testified that Stark "did not report any meaningful psychiatric distress at the time I evaluated her and she certainly didn't display any. She was perfectly normal in all aspects of her interactions with me." Dr. Hughes believed Stark did not sustain any psychological or psychiatric injury as a result of her work injury. Dr. Hughes testified Stark did not have any ongoing psychiatric disability, permanent or otherwise. He felt she needed no psychiatric treatment. "Stark simply reports the typical, predictable, and normal human responses of frustration and occasional anger that most humans with chronic physical pain experience, as well as the understandable normal worries about her financial state, given her limited employment status currently."

Dr. Hughes also testified that he reviewed Dr. Barnett's report and did not find anything in it that would medically support his diagnoses. He testified that there was no medical literature or evidence to support a late diagnosis of dysthymic disorder. That

7

diagnosis was based on lifelong chronic depression symptoms beginning in early adulthood at the latest.

Terry Cordray, a vocational rehabilitation counselor, conducted a vocational interview of Stark in April 2014 at Good Samaritan's request. He testified that Stark had not sustained any wage loss after her work injury. Based on Dr. Koprivica's physical restrictions, she would not be able to return to her job as a CNA where she earned $9/hour, but she could return to a prior job as a communications dispatcher for Rawlins County earning $10.50/hour. He stated that she also had the education and skill level to do other office clerical jobs with similar wages in her home area because she had an associate's degree, previous office clerical experience, and computer skills. "She's not only employable, she's placeable." Cordray did not, however, do a job search in the area. He did not believe Stark's age (65) would impede her ability to find employment. Cordray did acknowledge that Stark was currently working for Good Samaritan for 5 hours a month at $9/hour. He testified that was not substantial gainful employment.

The ALJ found Stark suffered no permanent impairment as a result of her injury on September 30, 2011. The ALJ stated:

"The claimant admitted that prior to her neck surgery, she had some problems with her upper extremities. The surgery helped with her complaints but didn't totally resolve them. Dr. Hendler conducted the most recent physical examination. He determined that the claimant did not have any medical injury that the work accident was the prevailing factor and that she didn't have any permanent impairment as a result of the work accident. He stated that the claimant's symptoms were present before her work accident and it is much more likely to have come from the postoperative state. That the claimant is someone who is potentially at increased likelihood of have ongoing subjective symptomatology. He found that the claimant's strain injury was fully address[ed] and treated by mid November of 2011 based on the claimant seeing Dr. Badejo on November 18th and Dr. Badejo noting that there was no tenderness on palpating cervical and trapezius muscles. Any psychological conditions or impairments predated the claimant's work accident and she

8

didn't suffer any permanent functional disability as a result of that accident. After review of all the evidence presented, it is found that the claimant did not suffer any permanent impairment and she is not permanently totally disabled as a result of her work injury."

The ALJ also denied Stark's request for future medical treatment.

Upon review, the Board modified the ALJ's award. The Board adopted Dr. Koprivica's finding that Stark had a 5% function impairment on account of her September 30, 2011, injury at work. The Board found, though, that Stark did not have any permanent impairment because of a traumatic neurosis.

The Board further found that Stark was not entitled to work disability because she did not prove "at least a 10% whole body functional impairment caused solely by her work injury, as required by K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i). Additionally, claimant did not prove what task loss her work injury caused, as opposed to task performing ability she lost due to her prior neck surgery." The Board found that the bulk of Stark's work restrictions were due to her fusion and not to her strain.

The Board found Stark was not permanently and totally disabled. The order stated: "While she works about five hours per month, which is not substantial and gainful employment, such fact is not dispositive in proving she is unable to engage in substantial and gainful employment on account of her injury." The Board concluded Stark proved entitlement to permanent partial disability benefits based on a 5% impairment of function and to future medical treatment. But, she was not entitled to work disability or benefits based on permanent total disability.

One Board member dissented, finding Stark permanently and totally disabled. The Board member opined that Stark's reduction in work hours "only occurred after and

9

because of her work injury . . . ." The Board member also found that Stark's age would hamper her ability to find work within her restrictions around the Atwood labor market.

Stark timely appealed the Board's impairment rating and its denial of her disability claims. Good Samaritan cross-appealed the Board's award of coverage for future medical treatment.

ANALYSIS

As her primary complaint on appeal, Stark contends that overwhelming evidence supports a finding that she is permanently and *totall*y disabled rather than permanently and *partially* disabled.

An appellate court reviews a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported by the appropriate standard of proof by substantial evidence. See K.S.A. 2015 Supp. 77-621(c)(7). This requires the appellate court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. The court does not reweigh evidence or engage in de novo review. K.S.A. 2015 Supp. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). "Substantial evidence" refers to evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. *Ward v. Allen County Hospital*, 50 Kan. App. 2d 280, 285, 324 P.3d 1122 (2014).

A permanent total disability exists "when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of

10

substantial and gainful employment. Expert evidence shall be required to prove permanent total disability." K.S.A. 2011 Supp. 44-510c(a)(2).

Stark first contends that the Board failed to consider the totality of the circumstances as required by *Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, 114, 872 P.2d 299 (1993). The *Wardlow* court found there was substantial evidence to support a finding that a claimant was permanently and totally disabled based on the totality of the circumstances including the claimant's serious and permanent injuries, experts' opinions, the limited physical chores the claimant could perform, the claimant's age, the claimant's lack of training, the claimant's driving and transportation problems, the claimant's past history of physical labor jobs, the claimant's constant pain, and the claimant constantly having to change body positions. 19 Kan. App. 2d at 114-15. Evidence that the claimant could perform part-time, sedentary-type work did not invalidate the factual determination that he was permanently and totally disabled. 19 Kan. App. 2d at 115.

Good Samaritan contends that the analysis of *Wardlow* no longer applies, citing strict constructionism and *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 214 P.3d 676 (2009). The *Bergstrom* court did not discuss the holding of *Wardlow*. In *Bergstrom*, the Supreme Court disapproved of prior cases that imposed a requirement that claimants make a good-faith effort to seek out and accept alternate employment in order to claim work disability. 289 Kan. at 607-10. The court stated the prior cases "were decided contrary to the principle that an appellate court must give effect only to express statutory language, rather than speculating what the law should or should not be, and that we will not add something to a statute not readily found in it." 289 Kan. at 610.

The *Wardlow* court held:

> "Our Supreme Court has stated that 'when a workers' compensation statute is subject to more than one interpretation, it must be construed in favor of the worker if such construction is compatible with legislative intent.' [Citations omitted.] The trial court's finding that Wardlow is permanently and totally disabled because he is essentially and realistically unemployable is compatible with legislative intent." 19 Kan. App. 2d at 113.

In *Lyons v. IBP, Inc.*, 33 Kan. App. 2d 369, 376-78, 102 P.3d 1169 (2004), this court held that the ultimate holding in *Wardlow* did not depend on application of a claimant-favorable construction rule. The *Wardlow* court held that whether a claimant is permanently and totally disabled is a factual finding. *Lyons*, 33 Kan. App. 2d at 377. "'*Wardlow* still provides precedential guidance regarding what factors should be considered in the factual determination of what constitutes permanent and total disability.'" *Lyons*, 33 Kan. App. 2d at 378. Our court continues to cite *Wardlow* favorably. See, *e.g.*, *Huffman v. DeElliotte Co.*, No. 112,759, 2015 WL 3875402, at *3 (Kan. App. 2015) (unpublished opinion).

Stark contends the Board ignored several factors that support a finding of permanent total disability: her age, where she lives, physical restrictions, inability to perform basic household chores, inability to drive longer than 30 minutes to travel outside of the small town of Atwood, pain that she did not suffer prior to the work accident, including pain while resting her arm on a chair for any length of time, and psychological condition.

The Board did not specifically analyze each *Wardlow* factor in its order. But, the Board did state that it was "keenly aware of *Wardlow*, and the necessity of considering all factors when determining if claimant is permanently and totally disabled."

Stark's age and small town location are certainly not favorable for finding a job. But, the Board cited the testimony of the vocational rehabilitation counselor. The Board

stated: "Mr. Cordray opined claimant was employable and placeable in the open labor market." Cordray testified that, although Stark could not return to her job as a CNA based on the physical restrictions set by Dr. Koprivica, he believed she could return to a previous job as a communications dispatcher for Rawlins County. He testified that he believed she was employable despite her age and location because she had an associate's degree, computer skills, previous clerical skills, and a tax preparation background that made her more qualified than other applicants.

This court cannot reweigh the evidence, but we must consider the evidence contradicting the Board's findings. *Williams*, 299 Kan. at 795. Dr. Koprivica testified that Stark would not be able to perform the tasks necessary for a dispatcher. He found her permanently totally disabled. Dr. Murati also testified that Stark was "essentially and realistically unemployable." Dr. Barnett testified that "[b]ased on her age, where she's living, her physical restrictions, it's hard for me to imagine how she could be employed at all." The Board's reliance on Cordray's opinion in the face of the others is questionable, but it appears that the Board's denial of permanent total disability was based primarily on Stark's preexisting condition.

With regard to Stark's physical restrictions and pain, the Board noted that neither of Stark's hired experts could "parse out what restrictions claimant needed for her September 30, 2011 cervicothoracic strain versus the cervical spine fusion she had in June 2011." The Board found that Stark did not prove the limitation of her arms and the positions needed to assume to care for residents was the result of work injury, stating that "it is much more likely the bulk of claimant's restrictions and the reason for her reduction of hours was due to her spinal fusion and not to her cervicothoracic strain."

The Board also noted that "[w]hile she works about five hours per month, which is not substantial and gainful employment, such fact is not dispositive in proving she is unable to engage in substantial and gainful employment on account of her injury. Rather,

13

Dr. Hendler indicated claimant required no work restrictions *on account of her work injury . . . .*" (Emphasis added.)

The *Wardlow* court did not say how to analyze a preexisting injury when determining whether a claimant is permanently totally disabled because the claimant in *Wardlow* did not have a preexisting injury. 19 Kan. App. 2d 110. To determine whether the claimant was "'incapable of engaging in any type of substantial and gainful employment,'" the court used a take-the-claimant-as-he-comes kind of approach with respect to the claimant's age, education, training, and prior work experience. See 19 Kan. App. 2d at 114-15. A panel of this court noted that "[e]vidence a claimant *is capable* of engaging in employment would prove the claimant's actual capability, not a hypothetical capability which might exist under different circumstances of health, age, education, or other factors." *Perkins v. Prestige Cabinets*, No. 107,233, 2013 WL 646486, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 297 Kan. 1246 (2013). In *Perkins*, the claimant's preexisting head injury from a traffic accident was considered together with his work injury in determining the claimant was permanently and totally disabled. But, the court noted that the claimant was able to work with her head injury before the work-related injury. 2013 WL 646486, at *5.

The statute requires that the claimant's permanent incapability to work must be "on account of the injury." A "[p]ermanent total disability exists when the employee, *on account of the injury*, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment." (Emphasis added.) K.S.A. 2011 Supp. 44-510c(a)(2). The parties cite no cases interpreting "on account of the injury" in this statute. K.S.A. 2011 Supp. 44-501(e) states that an award of compensation for permanent total disability shall be reduced by the amount of functional impairment determined to be preexisting.

This court's decision in *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 200, 364 P.3d 571 (2015), suggests the inquiry is whether the work injury was the prevailing factor causing the claimant's resulting disability or impairment. A work accident must be the "prevailing factor causing the injury, medical condition, and resulting disability or impairment." K.S.A. 2011 Supp. 44-508(f)(2)(B)(ii). "'Prevailing' . . . means 'the primary factor, in relation to any other factor.'" K.S.A. 2011 Supp. 44-508(g). "An injury is not compensable *solely* because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." (Emphasis added.) K.S.A. 2011 Supp. 44-508(f)(2). In *Le*, this court reversed the Board's decision denying a claimant permanent total disability benefits. The claimant suffered a vertebral fracture in a work accident. The Board found the claimant's preexisting osteoporosis was the prevailing factor in the claimant's inability to return to work. The Board limited her award to permanent partial general disability. The court reversed because a review of the record as a whole revealed that, prior to the work accident, the claimant did not suffer chronic pain that prevented her from working. Thus the court remanded for the Board to reinstate the ALJ's award of permanent total disability benefits. 52 Kan. App. 2d at 199-200.

The claimant in *Le* was able to work full time without limitations despite her osteoporosis before the accident. Here, there was substantial evidence to support the Board's finding that "the bulk of" Stark's physical limitations were due to her fusion and not the work injury. Neither Dr. Murati nor Dr. Koprivica could distinguish which work restrictions were recommended based on Stark's cervical fusion versus her work injury. Dr. Koprivica did opine that Stark was "permanently totally disabled based on the impairment following the September 30, 2011, injury." Dr. Hendler testified that her symptoms were "much more likely" to have come from her postoperative state following her cervical fusion than her work injury. He testified that he would place her on no work restrictions "with respect to the injuries sustained on September 30, 2011." He characterized her work injury as a temporary aggravation of her preexisting injury.

15

Stark contends that even though the experts could not testify which work restrictions were caused by her work accident, it was clear that her pain and ability to carry out normal functions changed drastically after the accident because she had returned to 32-hour work weeks before the accident and her pain was new and different afterwards. This may be a case of unfortunate timing for Stark. If she had caught a falling resident years after her surgery, maybe the outcome would have been different. But she had just returned to working her regular hours the same month the accident occurred. And, she was still limited in the activities she could perform from her neck surgery. She could not push, pull, or lift anything over 5 pounds. She did experience new spasms after the accident. But, expert evidence is required to prove permanent total disability. K.S.A. 2011 Supp. 44-510c(a)(2). Stark's experts could not testify to what degree her inability to return to work was caused by the accident.

The Board further determined Stark had no permanent impairment of her mental health. The Board stated:

"Regarding traumatic neurosis, claimant testified things are 'really tough' and the evidence shows she is sad, angry and frustrated as a result of her September 30, 2011 accidental injury. The mental health experts testified claimant's primary care physician increased her dose of citalopram following her accidental injury. Dr. Barnett opined she had dysthymic disorder and a resulting 30% whole person impairment. Dr. Hughes observed no meaningful psychiatric distress. He noted she behaved perfectly normal in their interaction. Dr. Hughes stated claimant had no rateable psychiatric injury or disability.

"The burden of proof rests with claimant. Claimant was prescribed a higher dose of citalopram some time after her accidental injury, but there is no showing she ever requested or was treated for a work injury-related mental disorder, such as having counseling, and it does not appear she was evaluated by any mental health experts except those retained by the parties. We do not even know if the increase in citalopram was occasioned by claimant's accidental injury. Claimant's testimony, the facts of the case,

16

and the differing mental health expert opinions do not convince the Board that claimant proved she has permanent impairment as a result of a traumatic neurosis."

The Board's determination that Stark had no permanent mental health impairment was supported by substantial competent evidence. Dr. Hughes testified that Stark does not have any ongoing psychiatric disability, permanent or otherwise. "Stark simply reports the typical, predictable, and normal human responses of frustration and occasional anger that most humans with chronic physical pain experience, as well as the understandable normal worries about her financial state, given her limited employment status currently."

Stark next contends that the Board's shifting reliance on Dr. Hendler's opinion undermines its decision. With regard to Stark's functional impairment, the Board stated:

> "Both physicians hired by claimant found either cervicothoracic spasms or trigger points, whereas Dr. Hendler did not. The Board places no great significance in the fact that Dr. Hendler was the last physician to evaluate claimant. Of these opinions, the Board adopts Dr. Koprivica's 5% impairment rating as most accurately reflecting claimant's functional impairment on account of her September 30, 2011 accidental injury. Dr. Koprivica noted claimant's 5% rating was above and beyond the impairment associated with her cervical spine fusion."

With regard to whether Stark was permanently and totally disabled, the Board noted that Dr. Koprivica "could not parse out what restrictions claimant needed for her September 30, 2011 cervicothoracic strain versus the cervical spine fusion she had in June 2011." The Board further stated "Dr. Hendler indicated claimant required no work restrictions on account of her work injury . . . ."

The Board's decision is consistent. The Board concluded that Stark did not prove she was unable to engage in substantial and gainful employment on account of her work

17

injury. The only expert that could parse out which restrictions were on account of her work injury testified that none of the restrictions were on account of work injury.

Stark finally contends that the Board's reliance on Cordray's opinion regarding Stark's capability to earn a wage contradicts Kansas law. K.S.A. 2011 Supp. 44-510e(a)(2)(E) defines "wage loss" and states: "Where the employee is engaged in post-injury employment for wages, there shall be a rebuttable presumption that the average weekly wage an injured worker is actually earning constitutes the post-injury average weekly wage that the employee is capable of earning. The presumption may be overcome by competent evidence." Good Samaritan contends that the definition of wage loss for work disability calculations has nothing to do with the determination of whether a claimant has a permanent total disability.

Good Samaritan is correct that the presumption in K.S.A. 2011 Supp. 44-510e(a)(2)(E) is not part of the determination of whether a claimant has a permanent total disability under K.S.A. 2011 Supp. 44-510c(a)(2) under the plain language of the statute. Under K.S.A. 2011 Supp. 44-510e(a)(2), an injured employee's "wage loss" is used to determine the amount of the work disability award for permanent partial general disabilities. The greater the wage loss, the larger the award. See *Locke v. Barnds Brothers Inc.*, No. 112,029, 2015 WL 2137207, at *2 (Kan. App. 2015) (unpublished opinion).

In her second major area of complaint with the Board's findings, Stark contends that she was eligible to receive work disability benefits under K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i)-(ii) and therefore the Board erred in denying them.

Kansas law provides:

"(C) An employee may be eligible to receive permanent partial general disability compensation in excess of the percentage of functional impairment ('work disability') if:

18

(i) The percentage of functional impairment determined to be caused solely by the injury exceeds 7 1/2 % to the body as a whole or the overall functional impairment is equal to or exceeds 10% to the body as a whole in cases where there is preexisting functional impairment; and

(ii) the employee sustained a post-injury wage loss, as defined in subsection (a)(2)(E) of K.S.A. 44-510e, and amendments thereto, of at least 10% which is directly attributable to the work injury and not to other causes or factors." K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i)-(ii).

The Board found Stark had a 5% functional impairment on account of her work injury and a 25% preexisting functional impairment, for an overall functional impairment of 30%. The Board stated:

"Insofar as claimant had a 25% preexisting impairment from her neck surgery, she is not entitled to a work disability because she did not prove at least a 10% whole body functional impairment caused solely by her work injury, as required by K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i). Additionally, claimant did not prove what task loss her work injury caused, as opposed to task performing ability she lost due to her prior neck surgery."

The Board erred in stating that Stark needed to show her impairment exceed 10% *solely* based on her work injury. The plain language of the statute says the "*overall* functional impairment" must be equal to or exceed 10% and applies "in cases where there is a preexisting functional impairment." K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i). Thus Stark surpassed the 10% functional impairment required by subsection (i).

However, subsection (ii) requires that the employee sustained a postinjury wage loss "at least 10% which is directly attributable to the work injury and not to other causes or factors." K.S.A. 2011 Supp. 44-510e(a)(2)(C)(ii). The Board found that Stark failed to prove what task loss was caused by her work injury. Indeed, the testimony did not quantify a percentage of wage loss that was "directly attributable" to the work injury and

19

not to Stark's neck fusion. Thus, the Board did not err by denying Stark work disability benefits.

In short, we believe the Board's findings on all matters challenged by Stark are supported in the record by substantial competent evidence and ultimately reflect a proper interpretation of the law. Because of this, we are duty bound to uphold its findings.

One last area pointed to by Stark requires discussion. Immediately prior to oral arguments in this case, Stark's counsel submitted a Notice of Additional Authority pursuant to Supreme Court Rule 6.09(b)(1) (2015 Kan. Ct. R. Annot. 53). Stark contends that House Bill 2617, passed by the Kansas Legislature during its 2016 session, was a direct response to, and presumably corrective legislation for, the decision of the Board in this case. But Stark's counsel is incorrect. The changes proposed to K.S.A. 2015 Supp. 44-510e were removed from the bill by the House-Senate conference committee and are not included in the final enrolled copy of House Bill 2617 signed into law by the governor on May 17, 2016. See L. 2016, ch. 98, secs. 1-6. Therefore, this argument lacks merit.

Good Samaritan contends on cross-appeal that the Board did not make the necessary finding to support its award of future medical treatment. Under K.S.A. 2011 Supp. 44-525(a), "[n]o award shall include the right to future medical treatment, unless it is proved by the claimant that it is more probable than not that future medical treatment, as defined in subsection (e) of K.S.A. 44-510h, and amendments thereto, will be required as a result of the work-related injury."

The Board concluded that Stark was entitled to future medical treatment for her 5% impairment of function. The Board did not discuss future medical treatment in its analysis. But, the Board did state in its findings of fact that "[a]s far as future medical treatment, Dr. Koprivica believed claimant would benefit from future pain management."

20

In his report, Dr. Koprivica stated that "[i]t is more probably true than not that Ms. Stark is going to have current and ongoing life-long treatment needs." Therefore, there was substantial competent evidence to support the award of future medical treatment.

Affirmed.